# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:22-cr-00339-1 (RDM)** |
| v. | : | |
| | : | |
| ERIC CRAMER, | : | |
| | : | |
| Defendant | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Eric Cramer to ten months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. The sentencing guidelines range for this defendant, as calculated by the United States Probation Office and contemplated by the parties, is 8 to 12 months of incarceration, and the government's requested sentence falls at the middle of that guidelines range.[1]

### I.      Introduction

Defendant Eric Cramer, a 43-year-old business owner of a handyman service, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.

---

[1]      The estimated guideline range agreed to by the parties is 8 to 14 months' incarceration; however, the statutory maximum sentence for a violation of Section 1752(a)(2) is one year of imprisonment, and therefore the effective guideline range is 8 to 12 months' incarceration. U.S.S.G. § 5G1.1(c)(1).

Eric Cramer pleaded guilty to one count of Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). As explained herein, a sentence of incarceration is appropriate in this case because: (1) the defendant prepared for violence by bringing a facemask (with a respirator) and a baseball bat to the Capitol; (2) he grabbed an officer's baton on the Lower West Terrace when a group of officers were attempting to make their way through the mob and only relinquished his grip after another officer intervened in the struggle; (3) he grabbed an officer's arm on the Lower West Terrace as the officer was being pushed and pulled in different directions by rioters and officers; (4) he was on the front lines of the second breach of the Senate Wing door at approximately 2:45 p.m.; (5) he took a police baton home; (6) he posted a picture of the baton on Facebook after the riot and captioned it, "took it from the cop that hit me with it…so I guess that's my trophy"; (7) did not tell the truth when questioned by law enforcement agents about his conduct shortly after January 6, 2021; and (8) has not yet expressed remorse for his actions.

The Court must also consider that Eric Cramer's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Eric Cramer's crime support a sentence of ten months' incarceration in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 37 (Statement of Offense), ¶¶ 1-7.

*Defendant Eric Cramer's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, the defendant, Eric Cramer, and his brother, co-defendant Country Cramer, travelled from West Virginia to Washington, D.C. by automobile to support members of Congress who were challenging the 2020 election results. *See id.* ¶ 8. Eric Cramer and his brother were prepared for possible violence. Eric Cramer was dressed in a blue winter hat, an American flag neck/face covering, a dark grey jacket, grey cargo pants, a black hooded sweatshirt, and blue gloves.  At times, he also wore a gas mask with pink filters, and he carried a green backpack and blue baseball bat. *Id.* ¶ 9. Exhibit 1, below, is a picture taken on January 6, 2021 of Eric (blue) and Country Cramer (red):

**Exhibit 1**



At about 2 p.m., Eric Cramer joined the mob on the Lower West Terrace of the Capitol grounds. ECF 37 ¶ 10. Violence was breaking out between the mob and law enforcement at that time, and law enforcement was deploying crowd control measures, such as tear gas, to disperse the mob. While Eric Cramer was on the Lower West Terrace, a scuffle broke out between officers

attempting to make their way through the crowd and rioters at 2:02 p.m. *Id*. During the scuffle, Officer P.K. swung his baton, and Eric Cramer caught the baton, grasped it, and did not relinquish his grip on the baton until another officer intervened, whereupon he released his grip and backed away from the scuffle. *Id*. Exhibits 2-4, below are screenshots from bodycam and open-source videos of the incident:[2]

**Exhibit 2**



,

---

[2] The United States will separately submit video clips of the incident(s) to the Court.

4

**Exhibit 3**



Maranie Rae_Mob of Trump loyalists clash with Capitol Police  01:06

**Exhibit 4**



Shortly after the baton incident and in the same general area on the Lower West Terrace, an officer in the same line of officers making their way through the mob was being pushed by members the mob. Eric Cramer grabbed the arm of the officer who was being pushed by the mob and pulled by officers back into the police line at the same time. Eric Cramer grabbed the officer's arm for approximately two seconds and continued to attempt to insert himself into the scrum between officers and rioters. Exhibit 5, below, is a screenshot from an open-source video:

**Exhibit 5**



Following the incidents on the Lower West Terrace, Eric Cramer moved with the crowd of rioters to the Upper West Terrace of the U.S. Capitol building. He arrived at the Senate Wing Door at approximately 2:40 p.m. ECF 37 ¶ 11. The Senate Wing Door was the site of the initial breach of the Capitol building at 2:12 p.m. By the time of Eric Cramer's arrival at about 2:40 p.m., the Senate Wing Door had been re-secured by law enforcement. Exhibit 6, below, is a CCTV screenshot of Eric Cramer outside of the Senate Wing Door at 2:41 p.m.:

**Exhibit 6**



As shown above, Eric Cramer could see that there were police officers on the other side of the Senate Wing Door attempting to keep rioters out of the building. ECF 37 ¶ 11. Rioters, including Eric Cramer, then forcibly pushed their way through the Senate Wing Door, entering at approximately 2:47 p.m. Exhibits 7-8, below, are additional CCTV screenshots of Eric Cramer inside the Capitol building near the Senate Wing Door:

**Exhibit 7**



**Exhibit 8**



Eric Cramer was inside of the U.S. Capitol building for approximately five minutes, prior to exiting to the Upper Northwest Terrace, where he remained with his brother, Country Cramer, until after 3:06 p.m. ECF 37 ¶ 11.

*Social Media Posts*

After leaving the Capitol on January 6, 2021, Eric Cramer posted a picture of a police baton on his Facebook page and wrote that he "took it from the cop that hit me with it…so I guess that's my trophy." ECF 37 ¶ 12. Exhibit 12, below, is a copy of the Facebook post:[3]

**Exhibit 12**



On January 7, 2021, Eric Cramer continued to boast about his experience at the Capitol riot on Facebook. When his followers criticized him, he responded by stating:

---

[3] The name of the Facebook user Eric Cramer was replying to has been redacted by the FBI.

i was there...I saw the hate in the eyes of those dudes. I first [handily] felt the hate...I sure as hell don't need a crowd to feel special either. And for you to [say] he should have run a baton in my ribs is kinda bullshit....if I deserved it just for being in range well yeah I got alot of respect for him and for you for that matter. Thats like saying just because he could he should. But I did give him the respect of not hitting him back with it.

So to all who claim my verbiage was disrespectful....don't be quick to judge...unless you willing to stand up! I had one of those just doing his job cops run a baton in my ribs cause he thought he could,...until I took it from him!

On January 19, 2021, Eric Cramer was interviewed by the FBI (discussed below). After the interview, he communicated with friends on Facebook about the interview, stating "just a bunch of questions. Gotta give back the baton the cop hit me with."

*Defendant Eric Cramer's First Interview*

On January 19, 2021, Eric Cramer was interviewed at his residence in Romney, West Virginia by the FBI and West Virginia State Police (WVSP). Cramer stated that, on the morning of January 6, 2021, he and his younger brother, Country Cramer, traveled by automobile to Washington, D.C. He stated the purpose for their travel to D.C. was to "watch history." Eric Cramer brought a bullhorn from his truck, and Country Cramer carried it as they walked through D.C. towards the Capitol building.

Eric Cramer stated that after an announcement was made that a congressman had voted to discard the electoral votes of Arizona and Pennsylvania, he heard people in the crowd talking about rioters possibly trying to enter the Capitol building. He and his brother then proceeded to walk from the East side of the Capitol building towards the West side, where a disturbance was occurring. Upon their arrival on the Lower West Terrace, Eric Cramer and his brother noticed that pepper spray had been deployed in the area.

Eric Cramer told the interviewing agents that, at that point, his brother, Country, backed away from the area of the Capitol building due to the presence of the pepper spray. Eric Cramer

then stated that he walked toward the stairs located on the Northwest quadrant of the building where he observed officers attempting to keep rioters from entering the building. He further stated that while standing in a crowd of people between the reflecting pool and a barrier of scaffolding on the Lower West Terrace, he was hit in the right side of his torso by a police officer with an ASP baton. He immediately bent over on the side that he was struck as the officer dropped the baton.

Eric Cramer told the agents that he supports law enforcement, and his intention was to help the officers by keeping rioters from committing violent acts. He continued, stating that he believed that the officer who struck him was unaware of his (Eric Cramer's) true intention and was reacting to the chaotic situation. He advised the agents that he picked up the officer's dropped baton and held on to it to prevent it from being picked up by a rioter and used for additional violent actions.

He then told agents that he was pushed towards the doors of the Capitol building by a crowd of protesters and pushed into the Capitol building. Eric Cramer advised agents that upon entering the Capitol building, he did not engage in or observe any violent actions between police and rioters.

Eric Cramer told the agents that as soon as an opportunity to safely exit the Capitol building presented itself, he exited the building to locate and reunite with his brother, Country, near the reflecting pool area on the West side of the Capitol building. Eric and Country Cramer then went back to their vehicle and returned home to West Virginia on the evening of January 6, 2021.

Eric Cramer admitted that he was still in possession of the ASP baton that he took after being struck by the officer on Capitol grounds. He informed the agents that his children had played with the baton, and it was currently somewhere around his residence. He agreed to turn over the baton to the WVSP Barracks in Romney, West Virginia. He admitted that he posted a picture of the baton on Facebook after returning to West Virginia on January 6, 2021.

11

*Defendant Eric Cramer's Second Interview*

On August 17, 2021, Eric Cramer was re-interviewed by agents at his mother's residence in Augusta, West Virginia. He stated that he wanted to amend his original statement. Eric Cramer stated he and his brother, Country, were on the West side of the Capitol and detected pepper spray. Country became irritated by the mist from the pepper spray and walked away. He (Eric) continued up the steps and was pushed inside the building by rioters. He stood just inside the door for a short period until his brother, Country, came inside the building to find him. Once he reconnected with Country, they both exited through a window.

*The Charges and Plea Agreement*

On July 1, 2022, the United States charged Eric Cramer and Country Cramer by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104 (e)(2)(D) and (G). On July 8, 2022, law enforcement officers arrested them at the U.S. Courthouse in Martinsburg, West Virginia. On October 14, 2022, the United States charged Eric Cramer and Country Cramer by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 25, 2022, pursuant to a plea agreement, Eric Cramer pleaded guilty to Count Two of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(2). By plea agreement, Eric Cramer agreed to pay $500 in restitution.[4]

## III.    Statutory Penalties

Cramer now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, he faces up to twelve months of imprisonment and a fine of up to $100,000. He must also pay restitution under the terms of his or

---

[4]   On October 25, 2022, Country Cramer pled guilty to one count of violating § 5104(e)(2)(G). Sentencing is scheduled for February 23, 2023.

her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. There, the U.S. Probation Office calculated Eric Cramer's total adjusted offense level as 11, as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | +10 |
| Specific Offense Characteristics (U.S.S.G. §2A2.4(b)(1)(A)) (physical contact with police) | +3 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | +11 |

*See* PSR at ¶¶ 32-40.

The U.S. Probation Office calculated Eric Cramer's criminal history as category I. PSR at ¶ 44.   Based upon a total offense level of 11 and a criminal history category of I, the Sentencing Guidelines range is 8 to 14 months' incarceration.  However, the statutory maximum penalty for a violation of Section 1752(a)(2) is one year of incarceration, and therefore the Guidelines imprisonment range is 8 to 12 months. U.S.S.G. § 5G1.1(c)(1); PSR at ¶ 82. Eric Cramer's plea

agreement contains an agreed-upon estimated Guidelines' range of 8 to 14 months' incarceration, consistent with the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of ten months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while

staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Eric Cramer's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Eric Cramer, the absence of violent or destructive acts is not a mitigating factor. Had Eric Cramer engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Eric Cramer's case is when and how he entered the Capitol building. Prior to arriving at the Capitol on January 6, 2021, he prepared for violence by bringing a facemask with a respirator and baseball bat to Washington, D.C. By his own admission, Eric Cramer observed that officers were actively attempting to keep rioters out of the building and were deploying crowd control measures, such as pepper spray. This did not deter him. He proceeded toward the area where conflict was occurring in an effort to enter the building. While on the Lower West Terrace, Eric Cramer twice engaged a police line attempting to make its way through the mob. First, he grabbed the baton of an officer and did not relinquish it until another officer intervened. Next, he grabbed the arm of an officer who was being pushed by the mob and pulled back into the police line by other officers. He then made his way up the stairs to the Upper Northwest Terrace, where he was on the front lines of a mob positioned just outside of the Senate Wing Door. That door had been breached a half hour earlier, but officers had managed to re-secure it. Eric Cramer could observe officers on the inside of the building attempting to prevent re-entry. This did not deter him either. Eric Cramer assisted other rioters by forcibly pushing his way through the door at 2:47 p.m. and remained inside for approximately five minutes before exiting to the Upper Northwest Terrace, where he remained until approximately 3:06 p.m.

Another important factor is Eric Cramer's statements on social media. He boastfully posted a picture of a baton he had taken from Capitol grounds on his Facebook account and stated he "took it from the cop that hit me with it…so I guess that's my trophy." ECF 37 ¶ 12. He then repeated this statement in subsequent social media posts. The government is not aware of any evidence that Eric Cramer was struck by a baton or that he took it from an officer. The video of the scrum where Eric Cramer grabbed an officer's baton does not support his social media claims. It appears more likely that Cramer created a fictional narrative of what had happened in attempt to garner praise and attention on social media.

Eric Cramer's statements to law enforcement following January 6, 2021 are also troubling. When initially interviewed on January 19, 2021, Eric Cramer was untruthful in several respects. First, he did not tell the truth about his brother, Country, entering the Capitol building. It was not until seven months later that Eric Cramer changed his story, admitting that his brother entered the building. Country Cramer, Eric's brother and co-defendant, also told the same stories to law enforcement at the same times as Eric Cramer, which suggests that the brothers coordinated their stories before speaking to the interviewing agents. Eric Cramer also told the agents that he had been struck by a baton and claimed that he intended to aid law enforcement while he was in the crowd. Additionally, Eric Cramer stated that he was pushed into the Capitol building, which implies that it was against his will. These statements are not borne out by the video evidence and are contradicted by Eric Cramer's other statements that he was seeking to find a way into the building. Furthermore, CCTV shows Eric Cramer outside of the Senate Wing Door for at least five minutes prior to the mob pushing their way past officers. He had ample time to retreat from the area if he truly had no intention of entering the building.

To date, Eric Cramer has not expressed any remorse for his actions on January 6, 2021.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Eric Cramer

As set forth in the PSR, Eric Cramer's criminal history includes a 2004 conviction for assaulting a family member and a 2014 conviction for illegal possession of wildlife. PSR ¶¶ 42-43. The 2004 conviction is very serious and appears to have also involved a kidnapping incident. *Id*. ¶¶ 42, 46. Eric Cramer was also charged with assaulting a family member in 2006, in a case involving violations of protective orders, but he was found not guilty of the assault and the charge of violating a protective order was dismissed. *Id*. ¶ 47. The PSR also reflects a 2017 domestic assault charge involving Eric Cramer's then 15-year-old daughter; however, that charge was also dismissed. *Id*. ¶ 48. Since the time of the offense conduct in this case, Eric Cramer was charged in May 2021 with making and issuing a worthless check for $301.04. *Id*. ¶ 49.  Finally, the PSR also indicates that Eric Cramer has multiple traffic citations for speeding, a seat belt violation, no proof of insurance, and following too closely.  PSR ¶ 45.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to

convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Eric Cramer's planning for violence on January 6, 2021, by bringing and wearing riot gear, and his criminal conduct that day in Washington, D.C. show a lack of respect for the law. Furthermore, although he is in criminal history category I, Cramer's criminal history is significant. As noted above, the PSR reflects several charges and convictions for assault and battery of family members and a more recent charge for a worthless check. These factors, taken together, highlight the need for the sentence imposed to specifically deter Cramer from future crimes.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Cramer based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Cramer has pleaded guilty to Count Two of the Information, charging him with Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

20

sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States. v. Glen Mitchell Simon*, 1:21-CR-00162, the defendant was convicted under 18 U.S.C. § 1752(a)(2). Simon planned for violence at the Capitol by wearing a plated vest

and made physical contact with officers by pushing a bicycle rack against a police line.   After the riot, Simon celebrated his actions at the Capitol and was untruthful in an interview with the FBI. Simon had a prior conviction for disorderly conduct/fighting, for which he was fined $200, and he had a pending battery charge.  Like Eric Cramer, Simon faced a Sentencing Guidelines range of 8 to 12 months, and as here, the government sought a mid-range sentence of 10 months.  The court sentenced Simon to 8 months' incarceration.  However, were this Court to sentence Eric Cramer to 10 months' incarceration, there would be no disparity.  As discussed above, as a matter of law, any sentence within the guideline range will not ordinarily result in a disparity.  "A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."  *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to ten months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Andrew J. Tessman*
ANDREW J. TESSMAN
Assistant United States Attorney
District of Columbia – Detailee
West Virginia Bar No. 13734
300 Virginia Street
Charleston, WV 25301
(304) 345-2200
Andrew.Tessman@usdoj.gov

</div>

## CERTIFICATE OF SERVICE

On this 15th day of February, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:     */s/ Andrew J. Tessman*
ANDREW J. TESSMAN
Assistant United States Attorney
District of Columbia – Detailee
West Virginia Bar No. 13734
300 Virginia Street
Charleston, WV 25301
(304) 345-2200
Andrew.Tessman@usdoj.gov